UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------
IN RE:

FRANKLIN INDUSTRIAL COMPLEX, INC.              CASE NO. 01-67459
                                                                    Chapter 11
                                    Debtor                  Jointly Administered
--------------------------------------------------------
IN RE:

CHRISTINE FALLS OF NEW YORK, INC.              CASE NO. 01-67458

                                    Debtor
--------------------------------------------------------
IN RE:

TRAFALGAR POWER, INC.                                   CASE NO. 01-67457
                                                                    (Main Case)
                                    Debtor
--------------------------------------------------------
CHRISTINE FALLS OF NEW YORK, INC. and
TRAFALGAR POWER, INC.

                              Plaintiffs

                    vs.                                      ADV. PRO. NO. 06-80302

ALGONQUIN POWER CORPORATION, INC.
ALGONQUIN POWER U.S. HOLDINGS, INC.
ALGONQUIN POWER FUND (CANADA), INC.
and ALGONQUIN POWER SYSTEMS, INC.

                              Defendants
--------------------------------------------------------
APPEARANCES:

MENTER, RUDIN & TRIVELPIECE, P.C.              JEFFREY A. DOVE, ESQ.
Attorneys for Algonquin Entities/Defendants    Of Counsel
308 Maltbie Street, Suite 200
Syracuse, New York 13204-1498

HARRIS BEACH PLLC                          DAVID M. CAPRIOTTI, ESQ.
Attorneys for Debtors                      Of Counsel
One Park Place, 4th Floor
300 South State Street
Syracuse, New York 13202


Hon. Stephen D. Gerling, Chief U.S. Bankruptcy Judge

### MEMORANDUM-DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

Before the Court are two motions related to the December 28, 2006 complaint ("Complaint") filed by Christine Falls of New York, Inc. ("CFC") and Trafalgar Power, Inc. ("TPI") (collectively referred to as "Plaintiffs") against Algonquin Power Corp, Inc. ("Power"), Algonquin Power U.S. Holdings, Inc. ("Power U.S."), Algonquin Power Income Fund ("APIF"), Algonquin Power Fund (Canada) Inc. ("Canada"), and Algonquin Power Systems Inc. ("Systems") (collectively referred to as "Algonquin" or "Defendants"). The Complaint seeks an order declaring as a matter of law that Algonquin does not have a security interest in the escrowed proceeds of a judgment obtained by Plaintiffs against the engineering firm of Stetson-Harza Corp. (*See* Fact section, *infra*).

The first is a motion filed by Plaintiffs on April 9, 2007 seeking summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed.R.Civ.P.") and Rule 7056 of the Federal Rules of Bankruptcy Procedure ("Fed.R.Bankr.P."). The second is a motion filed on May 7, 2007 by Defendants also pursuant to Fed.R.Civ.P. 56 and Fed.R.Bankr.P. 7056, seeking an order denying Plaintiffs' motion for summary judgment, and granting Defendants' motion for summary judgment.

Plaintiffs' motion was originally scheduled for oral argument on April 24, 2007, but an

3

adjournment was granted in order to allow the Defendants time to file their own summary judgment motion and to allow both motions to be argued on the same day. Both motions were subsequently scheduled for oral argument on May 22, 2007, but the parties sought and received another adjournment to allow for additional time to file responses. The Court ultimately heard oral argument on both motions at its regular motion term in Utica, New York on June 26, 2007. Upon the conclusion of the June 26th hearing, the Court indicated that it would take both motions under submission on that date.

## JURISDICTION

The Court has jurisdiction over the parties and subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 1334, 157(a), (b)(1), (b)(2)(A), (K) and (M).

## FACTS

The Court will assume familiarity with the facts as set forth in certain related actions in the U.S. District Court for the Northern District of New York, including those set forth in the Report, Recommendation and Order of U.S. Magistrate Judge David E. Peebles dated November 8, 2000, in Civil Action No. 5-CV-1246 (Plaintiffs' Exhibit J).

By way of background, in the latter half of 1988 Aetna Life Insurance Co. ("Aetna") financed TPI's construction of seven hydroelectric plants located in New York State with a

4

$22,500,000 loan (the "Aetna Loan).[1]    That loan was restructured on January 15, 1996 and the parties entered into an Extension and Modification Agreement ("Modification Agreement") (Plaintiffs' Ex. P), as well as an Amended and Restated Collateral Trust Indenture ("Revised Indenture") (Plaintiffs' Ex. C and Defendants' Exhibit 10).

In the interim, in 1989, TPI had commenced an action against Stetson-Harza and the engineer employed by Stetson-Harza, Neal Dunlevy ("Dunlevy"),[2] who designed the power plants (Case No. 89-CV-1027).  This suit alleged that Stetson-Harza/Dunlevy committed engineering malpractice with respect to the design of the plants regarding the amount of power (and income) projected to be generated by the plants.  A jury trial was held from March 22, 1999 through April 14, 1999.  TPI succeeded in obtaining a $7.6 million judgment against Stetson-Harza/Dunlevy (the "Stetson-Harza Judgment").  *See Hydro Investors v. Trafalgar Power, Inc.,* 64 F. Supp. 2d. 225.  The Second Circuit Court of Appeals increased the damages awarded by the lower court by ruling that interest be added to the amount. TPI and Stetson-Harza subsequently entered into a stipulation setting the judgment amount at $11,100,000, which Stetson-Harza paid in January 2001.    An Order issued by  Magistrate Judge Peebles on February 2, 2001, required $9,975,726.61 of these proceeds to be deposited in an escrow account.

---

[1] TPI defaulted on this debt, and in negotiations with Aetna the Aetna Loan was replaced by an 'A' note ($6,700,000) and a 'B' note ($15,800,000).  Algonquin completed its purchase of the 'B' note on March 27, 1997.  The 'A' note was also later sold to Algonquin.

[2] "Dunlevy who also performed engineering services for TPI as an independent individual and, as the principal of Hydro Investors, entered into a partnership/joint venture agreement with TPI regarding the development and future management of the projects. Dunlevy left the employ of Stetson-Harza in 1987."  *Hydro Investors, Inc. v. Trafalgar Power, Inc., Hydro Investors v. Trafalgar Power, Inc*, 63 F. Supp. 2d. 225, 227 (N.D.N.Y. 1999), *aff'd in part, vacated & remanded in part*, 227 F.3d 8 (2d Cir. 2000).

The Complaint, which is the subject of the two summary judgment motions currently before the Court, has its genesis in an action commenced by Algonquin on August 15, 2000 in the U.S. District Court, N.D.N.Y.(Case No. 00- CV-1246) against TPI, CFC, Pine Run Virginia, Inc. ("Pine Run"), and American Casualty ("Preliminary Injunction Action"). That action was commenced in response to TPI's filing of an assignment of the Stetson-Harza Judgment to its affiliate Pine Run. Algonquin sought, *inter alia*, a preliminary injunction and/or order of attachment precluding TPI from assigning the Stetson-Harza Judgment to Pine Run, which Algonquin alleged would prevent it from obtaining those funds to satisfy any judgment it might receive in another action pending in the District Court (Case No. 99-CV-1238).[3]

The Preliminary Injunction Action was referred to Magistrate Judge Peebles by Order of Senior U.S. District Judge Neal P. McCurn on August 21, 2000 for the issuance of proposed findings of fact and recommendation, which were issued on November 8, 2000. In that report, Magistrate Judge Peebles recommended that the District Court grant Algonquin's motion for a preliminary injunction but deny its motion for an order of attachment.

After the parties filed several objections to Magistrate Judge Peebles' Report, the District Court undertook a *de novo* review of the Report.[4] Judge McCurn, *inter alia*, adopted the recommendations of Magistrate Judge Peebles' Report, although for different reasons, denying Algonquin's request for an order of attachment but granting Algonquin's motion for a preliminary

---

[3] Case No. 99-CV-1238 is TPI's 1999 breach of contract action against Algonquin and Aetna regarding Aetna's sale of the "A" and "B" notes to Algonquin. In that action Algonquin counterclaimed seeking a declaration that it is the rightful owner of the Notes, as well as money damages as a result of TPI's alleged breach of the Revised Indenture with respect to the "B" Note.

[4] Pursuant to 28 U.S.C. § 636 (b)(1)(c).

6

injunction preventing TPI from assigning or otherwise disposing of the Stetson-Harza Judgment

proceeds.  *See Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, 131 F. Supp. 2d. 341 (N.D.N.Y.

2001) ("Judge McCurn's Decision I").

Plaintiffs filed Chapter 11 petitions on August 27, 2001 with the U.S. Bankruptcy Court

for the Eastern District of North Carolina.  These cases were transferred to this Court by Order

of the North Carolina Bankruptcy Court on December 13, 2001.


**ARGUMENTS**


**Plaintiffs**

Preclusive Effect

Plaintiffs first argue that Judge McCurn's Decision I granting Algonquin the preliminary

injunction while finding that Algonquin did not have a security interest in the Stetson-Harza

Judgment precludes Algonquin from re-litigating that issue in this proceeding.   Plaintiffs

acknowledge that the general rule is that "findings of fact and conclusions of law made in a

preliminary injunction proceeding, such as the one in which Judge McCurn issued his decision,

do not necessarily preclude reexamination of the merits at a subsequent trial."  *See Irish Gay and

Lesbian Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir. 1998).  As Judge McCurn's Decision I was

made in a preliminary injunction proceeding, the preclusive effect of collateral estoppel would

not seem to be relevant in this context.

Plaintiffs point out, however, that case law does make an exception to the general rule and

allows for preclusive effect for such decisions where "the party seeking to avoid such a ruling

7

chose the initial forum, instituted the preliminary relief application, and therefore had a full and fair opportunity to present all crucial evidence and witnesses." *See* Plaintiffs' Amended Memorandum of Law, p. 3, citing *Don King Prods., Inc. v. Douglas*, 742 F. Supp. 741, 755 (S.D.N.Y. 1990).

Plaintiffs' second argument is that Algonquin has no security interest in the proceeds of the Stetson-Harza Judgment under the Connecticut Uniform Commercial Code ("UCC"). The Indenture[5] is governed by Connecticut law. Connecticut's UCC, in effect when the Indenture was executed and the bankruptcy proceeding commenced, "exempts tort claims from its scope." *See* Plaintiffs' Amended Memorandum of Law, pp. 7-8. The Plaintiffs also cite to Connecticut case law holding that a creditor cannot assert an Article 9 security interest in a tort claim or the proceeds thereof. *See In re Ore Cargo*, 544 F.2d 80, 81-82 (2d Cir. 1976).

The Plaintiffs' third argument is that the Revised Indenture did not assign the Stetson-Harza Judgment, or the preceding tort claim, to Algonquin. Plaintiffs contend that to create a security interest by assignment, the security agreement must "clearly express the intent to create a secured interest in specific property." *See* Plaintiffs' Amended Memorandum of Law, p. 9 (citing *Evergreen Bank v. St. Onge* (*In re Onge*), No. 94-CV-1441, 1996 WL 77389, at *3 (N.D.N.Y. Feb. 21, 1996)).

Plaintiffs contend that "[a]lthough the Indenture provides that the Property assigned is

---

[5] The Indenture is the July 1, 1988 agreement between TPI and Connecticut Bank and Trust Co., which granted Connecticut Bank and Trust Co. (as security trustee) security for the $22,500,000 in notes held by Aetna. (Defendants Ex. 2). The Indenture was amended and restated on January 15, 1996 ("Revised Indenture") (Plaintiffs' Ex. C and Defendants' Ex. 10), but both parties agree that for the purposes of this matter there is no material difference between the Indenture and Revised Indenture. The rights granted in the collateral by the Indenture are referred to as the "Indenture Estate."

'without limitation,' the general language of the Revised Indenture does not demonstrate an intent to assign the tort claim or judgment against Stetson-Harza. Nor does it identify that claim or the judgment with 'particularity' as is required to constitute an assignment." *See* Plaintiffs' Amended Memorandum of Law, p. 11 (citations omitted). Plaintiffs assert that there is no mention in the Indenture or the annexes thereto ("Annexes") of a tort claim or judgment, despite the fact that Aetna, which drafted the Indenture, was "well aware of TPI's claim against Stetson-Harza at the time the Revised Indenture was executed." *See id.* Plaintiffs assert that without the Indenture specifically referencing the tort claim or the Stetson-Harza contract, the Indenture did not assign, and Defendants do not have a security interest in the tort claim, the Stetson-Harza Judgment or the proceeds of these under Connecticut law, which governs the Indenture. To bolster this argument, Plaintiffs again cite to *In re Ore Cargo*, this time for the proposition that a security agreement does not assign a tort claim when that agreement does not reference such a claim.

**Defendants**

Defendants assert that Judge McCurn's Decision I is not entitled to res judicata or collateral estoppel effect because that decision was issued in a preliminary injunction proceeding, which "do[es] not preclude reexamination of the merits at a subsequent trial." *See* Defendants' Memorandum in Opposition, p. 5 (citing *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).

Defendants acknowledge that in certain circumstances decisions issued in preliminary injunction proceedings may have res judicata or collateral estoppel effect, but argue that those circumstances are not present here. In support of their contention that Judge McCurn's Decision

I was not "rendered practically final," as required in some cases holding that a preliminary injunction decision may have collateral estoppel or res judicata effect. *See, e.g., Lummus Co. v. Commonwealth Oil Ref. Co.*, 297 F.2d 80, 89 (2d Cir. 1961)), Defendants contend that

1) Judge McCurn conducted no evidentiary hearings;
2) there was no trial on the merits;
3) evidence submitted was based on affidavits of attorneys lacking personal knowledge; and
4) the decision was not upheld on appeal. (Algonquin did not appeal it because it was granted the injunction it sought. Defendants also assert that the decision itself was not subject to appeal.)

As further evidence that Judge McCurn's Decision I was not final for purposes of collateral estoppel and res judicata, Defendants quote Judge McCurn's statement that ". . . Algonquin cannot *at this time* demonstrate a probability of success on the merits." *See Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, 131 F. Supp. 2d. at 348 (emphasis added). To the same end, Defendants also cite to Judge McCurn's language in a subsequent Memorandum-Decision and Order, in which (in the decision's background section) he indicated that "[t]he proceeds from the malpractice action were ultimately placed in an escrow account *pending a determination on the merits on [sic] the parties' various claims.*" *See Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, No. 99-CV-1238, No. 00-CV-1246, slip op., at 4 (N.D.N.Y. April 23, 2001) ("Judge McCurn's Decision II")(emphasis added).

To buttress their argument that "the record was not fully developed and that a full hearing on the issues was not conducted," Defendants cite Judge McCurn's statement that it "is undisputed that the Trust Indenture does not specifically identify TPI's $7.6 million judgment even though the parties knew of the judgment when entering into that agreement." *See* Defendants' Memorandum in Opposition, p.7, quoting *Trafalgar Power, Inc. v. Aetna Life Ins.*

10

*Co.*, 131 F. Supp. 2d. at 348. Defendants correctly note that Judge McCurn misstated the facts

because the judgment was not entered until three years after the Revised Indenture was executed.

Defendants contend that Judge McCurn did not address Algonquin's claim to an interest

in the tort claim pursuant to either Connecticut common law, or Algonquin's rights under the

Consolidation, Extension Spreader and Modification Agreement, dated December 15, 1988

(Defendants' Ex. 5) ("Consolidation Agreement").[6] Defendants claim it was not necessary for

Judge McCurn to consider these issues because the primary purpose of the preliminary injunction

proceeding was to determine Algonquin's right to have TPI enjoined from transferring the

judgment to Pine Run, not to determine Algonquin's interest in the tort claim.

Defendants also assert that the findings in both of Judge McCurn's Memorandum-

Decisions and Orders "were rendered moot when the parties to the litigation entered into a

stipulation and order on February 1, 2001 providing for exactly the same relief granted by Judge

McCurn's Memorandum Decision and Order." *See* Defendants' Supplemental Memorandum in

Opposition, June 19, 2007, p. 5.

### *Algonquin's Purported Security Interest*

Defendants argue that Algonquin's rights in the Indenture Estate emanate not only from

the Indenture but also from other documents such as a series of mortgages and two stock

agreements. Defendants contend that as a result, these documents must be examined in order to

---

[6] The Consolidation Agreement, between the same parties as the Indenture Agreement, merely grants to the security trustee (and hence, any subsequent holder of the related notes) an interest in the consolidated mortgages related to the financed facilities. It is contained in Defendants' Ex. 5.

determine whether, under Connecticut or New York common law, Algonquin has a valid security

interest in the tort judgment proceeds.

In order to support their argument that the Indenture grants Algonquin a security interest

in the tort judgment, Defendants quote extensively from that document, which grants Algonquin

a security interest in

> . . . all Property, rights and privileges of the Companies, now owned or hereafter acquired, including (without limitation):
>
> (1) the Property described in Annex 2 . . .
> (2) all cash now or in the future delivered to the Security Trustee in accordance with the provisions of the Indenture or any of the Assigned Agreements; and
> (3) all of the right, title and interest, powers, privileges and other benefits of each of the Companies under each and every one of the leases, contracts, permits, licenses, franchises, certificates, insurance policies, warranties, bonds and other agreements (the "assigned Agreements") to which it is a party or pursuant to which it has been granted rights, including, without limitation, those Assigned Agreements described in Annex 3 . . .
>
> In each case, together with all proceeds thereof and any replacements, additions, accessions or substitutions thereof or thereto, all after-acquired Property, and all accounts and proceeds arising from the sale and disposition thereof. . .

Defendants' Memorandum in Opposition, p. 9, citing Granting Clause A, Collateral Trust

Indenture, p. 2, July 1, 1988 (Defendants' Ex. 2).

also:

> It is further agreed that the Security Trustee shall hold any and all other Property and any and all rights, interests, privileges and positions granted to it in accordance with the provisions hereof, the provisions of the Note Purchase Agreement, the Consolidation Agreement, and the provisions of any other document contemplated hereby or thereby, as security trustee for the holders, from time to time, of the Notes. . .as security for, or as additional sources of payment of, the Indenture Indebtedness, and for the uses and purposes and subject to the terms and provisions set forth in this Indenture.

Defendants' Memorandum in Opposition, p. 10, citing Indenture, Granting Clause B, p. 3, July

1, 1988 (Defendants' Ex. 2).

Defendants next refer to the Consolidation Agreement, which they maintain grants

Algonquin a security interest in

> . . . all estate, right, title and interest of [TPI] in and to all awards, settlements and
> other compensation, and interest thereon, hereafter made in connection with any
> condemnation, eminent domain or similar proceeding or for, or in lieu of, any
> taking under the power of eminent domain of any of the property. . . or any part
> thereof, including without limitation, any awards and compensation for change of
> grade of streets or any other injury to or **decrease in the value of such property**,
> all of which awards and other compensation are hereby assigned to Mortgagee,
> which is hereby authorized and appointed attorney in fact for [TPI] to . . . receive
> the proceeds of such awards and other compensation . . . .

*See* Defendants' Memorandum in Opposition, p. 10, quoting the Consolidation Agreement,

Defendants' Ex. 5, at pp. 7-8.

The "decrease in the value of such property" language is important to Defendants because

they assert that the Stetson-Harza Judgment was based in part on a decrease in value in the plants

caused by Stetson-Harza's engineering malpractice.    Defendants contend that although

Connecticut common law bars the assignment of a personal injury tort claim, contract claims are

assignable under Connecticut law.  Defendants acknowledge, however, that Connecticut law has

not addressed whether tort claims for property damage or engineering malpractice claims can be

assigned.  On this point, Defendants interpret conflicting case law in such a way as to conclude

that under Connecticut common law the issue of assignability of tort claims for property damage

depends on *public policy*, and that there is no policy consideration which would prohibit the

assignment of the instant tort claim or the judgment proceeding from it.  Moreover, Defendants

contend that any possible bar to assignment of a tort claim under Connecticut law disappeared

when the tort claim became a judgment on April 15, 1999.

13

As for New York common law, Defendants cite to *RTC Mortgage Trust 1994 N-1 v.
Fidelity Nat'l Title Ins. Co.*, 16 F. Supp. 2d. 557, 564 (D.N.J. 1998) for the proposition that there
are no "magic words" necessary to assign a tort claim, and that language in an assignment
agreement which reflects an "unambiguous intent . . . to transfer everything that it owned" (*Id.*)
constitutes an assignment.  Defendants argue that the intent of the language quoted above from
the Granting Clauses of the Indenture Agreement, as well as the Consolidation Agreement, clearly
evince such an unambiguous intent.

Defendants acknowledge that New York Article 9 UCC law in effect at the time of the
Indenture did not apply to the assignment of commercial tort claims.  They contend, however, that
when the Revised UCC Article 9, which does provide for the assignment of commercial tort
claims, went into effect in New York on July 1, 2001, Algonquin's security interests granted
under the mortgages automatically attached to the commercial tort claim and its proceeds and
became perfected on that date.  In support of this contention Defendants cite Rev. N.Y. UCC §
9-702(a), which states that "Revised Article 9 applies to a transaction or lien within its scope,
even if the transaction or lien was entered into or created before Revised Article 9 takes effect."
Additionally, Defendants argue that because the instant action itself was commenced after the
July 2001 effective date ("Effective Date") of the Revised Article 9 in New York, that Revised
Article applies to this case.

Once Defendants have argued that Revised N.Y. Article 9 applies, they go on to quote
from the Official Comments to Rev. N.Y. UCC § 9-109 to the effect that "once a claim arising
in tort has been settled and reduced to a contractual obligation to pay, the right to payment
becomes a payment intangible and ceases to be a claim arising in tort." *See* Defendants'

Memorandum in Opposition, p. 19, quoting Official Comment 15 to Rev. N.Y. UCC § 9-109.

Defendants contend that since Algonquin has a valid security interest in general intangibles, under

Revised Article 9 Algonquin has a valid security interest in the escrowed funds.  *See* Defendants'

Memorandum in Opposition, p. 19; Defendants' Supplemental Memorandum in Opposition, p.

9.

Defendants also cite to *In re Vienna Park Properties*, 976 F.2d 106 (2d Cir. 1992) for the

proposition that "a contingent right to payment [such as an escrow account] constitutes a general

intangible." *See* Defendants' Memorandum in Opposition, p. 20.    Defendants argue that,

consequently, even if Algonquin did not have a security interest in the tort claim or judgment,

when the funds were deposited into the escrow account, Defendants then had an interest in the

funds.  This is so, Defendants contend, because TPI's ability to control the funds was restricted

first by the preliminary injunction, and then by the escrow agreement.  As a result, TPI had only

a contingent interest in the funds.  And because a contingent right to payment is a general

intangible, Algonquin has a security interest in the escrow account because both the Indenture

Agreement and the Consolidation Agreement grant Algonquin a security interest in general

intangibles.

Defendants also disagree with TPI's reliance on *In re Ore Cargo*, 544 F.2d at 82 because

that case dealt with a security agreement which, unlike the instant case, limited itself to an interest

granted under the UCC.  Such a case would have nothing to say, Defendants contend, regarding

the language in the financing documents being sufficient to constitute a common law assignment

of the interest in question.

## DISCUSSION

Summary Judgment Standard

The standard for summary judgment is well settled. *See 325 Bleecker, Inc. v. Local Union No. 747*, No. 02-CV-844, 2007 U.S. Dist. LEXIS 24052, at *17 (N.D.N.Y. March 31, 2007). Summary judgment is appropriate pursuant to Fed.R.Civ.P. 56, made applicable to this proceeding by Fed.R.Bankr.P. 7056, when the evidence demonstrates that "there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law." *See Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986). In reviewing the pleadings, affidavits and depositions, the Court must "resolve all ambiguities and draw all inferences in favor of the non-moving party. *See Chan v. Gantner*, 464 F.3d 289, 292 (2d Cir. 2006).

**Preclusive Effect**

Judge McCurn's Decision I was indeed issued pursuant to a request for a preliminary injunction. Absent an exception, this would prevent it from having preclusive effect in a later proceeding. Both parties admit as much.

The exception to this general rule is articulated in *Commodity Futures Trading v. Bd. of Trade*, 701 F.2d 653, 657 (7th Cir. 1983); *Miller Brewing Co., v. Jos. Schlitz Brewing Co.*, 605 F.2d 990 (7th Cir. 1979); *Zdanok v. Glidden Co.*, 327 F.2d 944, 955 (2d Cir. 1964); *Lummus Co. v. Commonwealth Oil Ref. Co.*, 297 F.2d at 89; *Don King Prods., Inc v. Douglas*, 742 F. Supp. at 747; *State of New York v. Mayer*, No.90-CV-176, 1990 W.L. 164686, at *2 (N.D.N.Y. Oct. 19, 1990); *B.N.E. Swedbank, S.A. v. Banker*, 791 F. Supp. 1002, 1004 (S.D.N.Y. 1992). The relevant

criteria for the exception contained in these cases can be quoted briefly: the exceptions arise "in circumstances where a ruling is rendered 'practically' final owing to factors demonstrating 'that it was not avowedly tentative [], the adequacy of the hearing, and the opportunity for review.'" *Don King Prods., Inc., v. Douglas*, 742 F. Supp. at 754, quoting *Lummus Co. v. Commonwealth Oil Ref. Co.*, 297 F.2d at 89; *see also Zdanok v. Glidden Co.*, 327 F.2d at 956 (also quoting *Lummus Co.* for the view that "'finality in the context here relevant may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again'").

## Algonquin's Arguments Against Preclusive Effect

_____Before examining the extent to which the instant case falls within the exception to the general rule that the disposition of a request for a preliminary injunction will not be afforded preclusive effect, the Court will first examine some of Algonquin's arguments against Judge McCurn's  Decision I being accorded preclusive effect.

*"At this time"*

First, Algonquin stresses the use of the phrase "at this time" in Judge McCurn's Decision I, confirming Magistrate Judge Peeble's proposed findings of fact and recommendation (*Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, 131 F. Supp. 2d. at 348). *See, e.g.*, Defendants' Memorandum in Opposition, May 7, 2007, p. 7; Defendants' Supplemental Memorandum in Opposition, June 19, 2007, p. 4; Defendants' Oral Argument before this Court on June 26, 2007. As discussed *supra*, this decision found that Algonquin was entitled to a preliminary injunction freezing the proceeds of the $7.6 million tort judgment TPI obtained in its professional

malpractice action against Stetson-Harza Corp.

Judge McCurn's use of the phrase "at this time" is important because Defendants refer to it repeatedly to counter Plaintiffs' argument that Judge McCurn's ruling that Algonquin did not have a security interest in the $7.6 million tort judgment was "'practically' final owing to factors demonstrating 'that it was not avowedly tentative. . .'" *See Don King Prods., Inc. v. Douglas*, 742 F. Supp. at 754.

As a result, an examination of Judge McCurn's exact use of the phrase "at this time" is in order:[7]

> In light of the court's de novo determination that Algonquin cannot show a probability of success on the merits of its conversion claim, and that its section 273 and 276 claims do not support an order of attachment under CPLR § 6201 *at this time*, it is unnecessary to review the Magistrate Judge's additional findings . . .

*Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, 131 F. Supp. 2d. at 349 (emphasis added).

A review of the exact language and punctuation of this paragraph reveals that Judge McCurn was addressing two separate items: 1) the probability of success on the merits of Algonquin's conversion claim, and 2) that Algonquin's §§ 273 and 276 claims do not support an order of attachment . . . *at this time*.[8] The phrase "*at this time*" modifies only the second of the two items: that Algonquin's §§ 273 and 276 claims do not support an order of attachment. What leads the Court to this conclusion is, in large part, Judge McCurn's placement of a comma after

---

[7] The Court agrees with, and takes seriously, Plaintiffs' contention that "resolution of this issue is more an exercise in reading comprehension than legal analysis." *See* Plaintiffs' Amended Memorandum of Law, p. 5.

[8] And as we shall see *infra*, it is in its conversion claim, not its §§ 273 and 276 claims, that Algonquin contends that it has a security interest in the $7.6 million tort judgment.

the word "claim" and before "and", as well as the lack of a comma before the phrase "at this time." [9]

However, the Court need not rely solely on Judge McCurn's careful attention to proper punctuation in order to arrive at the conclusion that the phrase "at this time" modifies only the court's finding that Algonquin's §§ 273 and 276 claims do not support an order of attachment, and not the finding that Algonquin's conversion/security interest claim "lacks merit." *See Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, 131 F. Supp. 2d. at 348. The reasoning and language of the decision itself dictate this conclusion. Earlier in the same decision we read that "Algonquin asserts that the assignment[10] is an unlawful conversion based upon language in the Trust Indenture *and, further*, that the assignment violates sections 273 and 276 of the New York Debtor and Creditor Law." *Id.* at 345 (emphasis added). These are clearly two separate assertions, and Judge McCurn treats and analyzes them as such.

In analyzing Algonquin's conversion claim, Judge McCurn states that:

Algonquin contends that it has a superior right of possession to specific money because the Trust Indenture grants it a security interest in TPI's $7.6 million judgment. This contention lacks merit. [Algonquin] . . . cannot demonstrate a superior right of possession to TPI's tort judgment. It is undisputed that the Trust Indenture does not specifically identify TPI's $7.6 million judgment even though the parties knew of the judgment when entering into that agreement. More importantly, article 9 of the [Connecticut] Uniform Commercial Code specifically exempts the transfer of a tort claim from security interests. Algonquin cannot show an immediate right of possession to TPI's tort judgment and, thus, fails to show a probability of success on the merits of its conversion claim.

---

[9] Those who would minimize the importance of comma placement are reminded of Justice Blackmun's analysis in *United States v. Ron Pair Enterprises, Inc*., 489 U.S. 235 (1989).

[10] The assignment referred to is TPI's attempted assignment of the tort judgment to Pine Run.

*Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, 131 F. Supp. 2d. at 348.

There are no limiting temporal references in this analysis. There is nothing to lead the reader to believe that Judge McCurn's finding that Algonquin's assertion that it had a specific interest in the tort judgment "lacks merit" was only a preliminary or temporary holding, subject to further litigation or developments.[11] However, when Judge McCurn turns to his analysis of Algonquin's §§ 273 and 276 claims, he opines that "[w]hether Algonquin's section 273 and 276 claims independently support an order of attachment under CPLR § 6201 *at this stage in the litigation* is doubtful." *Id.* at 349 (emphasis added). Here the origin and purpose of Judge McCurn's phrase "at this time" becomes clear. It is limiting language meant to parallel and reinforce his earlier finding that Algonquin's §§ 273 and 276 claims did not support an order of attachment *at that stage* of the litigation.[12] Accordingly, the Court reads Judge McCurn's Decision I to limit his use of the phrase "at this time" exclusively to his finding regarding Algonquin's New York Debtor and Creditor Law §§ 273 and 276 claims, and not to his finding

---

[11] This interpretation is further bolstered by a later sentence in the decision, which (unlike Judge McCurn's finding regarding the §§ 273 and 276 claims) also lacks any type of limiting language: "As already discussed above, Algonquin cannot show an immediate superior right of possession in TPI's tort judgment and, as a result, does not demonstrate a likelihood of success on the merits of its conversion claim." *See Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, 131 F. Supp. 2d. at 352.

[12] The reason Judge McCurn found that Algonquin's §§ 273 and 276 claims did not support an order of attachment "*at [that] stage in the litigation*" is because in order to be entitled to an order of attachment, a claimant must demand a money judgment and possess a matured claim. In the action before Judge McCurn, however, Algonquin sought equitable relief rather than a money judgment, and its claim was <u>un</u>matured because "TPI's debt to Algonquin "[was] premised upon Algonquin's success in 99-CV-1238 [TPI's 1999 breach of contract action against Algonquin and Aetna regarding Aetna's sale of the A and B notes to Algonquin]." *See Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, 131 F. Supp. 2d. at 349 n.9.

that Algonquin's conversion/security interest claim "lacks merit."[13]

Despite this reading, both parties seem to believe that Judge McCurn meant for the phrase "at this time" to modify his finding that Algonquin's claim regarding its purported security interest in the tort judgment "lacks merit."  Counsel for Defendants commenced his oral argument on June 26, 2007 in this Court by stating that Judge McCurn had found that Plaintiffs "could not *at this time* demonstrate a superior right to the tort claim under Connecticut UCC."  Surprisingly, even counsel for Plaintiffs, at the same oral argument, stated that Judge McCurn had found that Plaintiffs could not "demonstrate a superior right or security interest *at that time.*"

This Court finds that because Judge McCurn did not temporally limit his finding that Algonquin's assertion that it had a security interest "lack[ed] merit," Defendants cannot cite Judge McCurn's use of the phrase "at this time" in support of their argument that his holding regarding Algonquin's lack of a security interest in the Stetson-Harza Judgment was not "practically final."

### No Evidentiary Hearings

Secondly, Defendants assert that Judge McCurn's Decision I was not final for purposes of collateral estoppel because the judge conducted no evidentiary hearings.  However, Defendants acknowledged in open court on June 26, 2007 that there are no material issues of fact in this litigation.  Defendants fail to point out what purpose an evidentiary hearing would have served

---

[13] The only other place in Judge McCurn's Decision I where the phrase "at this time" appears is in the sentence "[a]nd although Algonquin satisfies the first element for an order of attachment, i.e., that a claim for a money judgment exists, Algonquin cannot at this time demonstrate a probability of success on the merits." *See Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, 131 F. Supp. 2d. at 348.  Here again, Algonquin's request for an order of attachment is based upon the §§ 273 and 276 claims, which do not involve the security interest issue.

in this case and fail to point out why they did not request one.

<u>No Trial on the Merits</u>

Thirdly, Algonquin contends, as further evidence that the decision was not final, that "the action in which the decision was issued sought the return of a fraudulently transferred judgment, [and] that there was no trial on the merits. . ."  Defendants' Memorandum in Opposition, p. 6. Here the Court is reminded of the cautionary remarks of the late Judge Philip W. Tone of the Court of Appeals of the Seventh Circuit in *Schlitz*, a case cited by Defendants:

> Whatever the litigation strategy that motivated [the] decision to seek a preliminary injunction. . ., that decision entailed the risk, familiar to any experienced litigation lawyer, that the decision on the preliminary injunction might have the effect of determining the merits, either legally, through the law of the case, or as a practical matter.

*Miller Brewing Co. v. Jos. Schlitz Co.*, 605 F.2d at 993.

The only real distinguishing factor between *Jos. Schlitz Co.* and the instant case is that in *Jos. Schlitz Co.*, the party seeking to have the denial of a preliminary injunction in a related case, namely *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75 (7th Cir. 1977), given preclusive effect was the defendant, Joseph Schlitz Brewing Co.  In *G. Heileman Brewing Co.*, the district court had granted Miller Brewing Co. a preliminary injunction.  On appeal, however, the Seventh Circuit Court of Appeals reversed the holding of the district court based on the finding that probability of success could not be established by Miller Brewing.  In the *Jos. Schlitz Brewing Co.* case, the defendant, Joseph Schlitz Brewing Co., sought summary judgment based on the preclusive effect of the prior holding in the *Heileman Brewing Co.* case, despite the fact that the Miller Brewing Co. had not sought a preliminary injunction against the Joseph Schlitz Brewing Co.  The district court granted summary judgment, giving no credence to Miller's

argument that it had not had an opportunity to litigate the issue concerning whether the word

"light" or "LITE" as applied to beer is generic in the prior case in which it had ultimately been

denied a preliminary injunction . *See Miller Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d

at 992.  The Seventh Circuit affirmed the application of collateral estoppel on that issue and the

granting of summary judgment.

In Judge McCurn's Decision I, Algonquin was granted a preliminary injunction from

which no appeal was taken.  Based on the analysis in *Jos. Schlitz Brewing* Co., this Court must

conclude that Judge McCurn's Decision I should be given preclusive effect in the adversary

proceeding pending in this Court, despite the fact that there was no trial on the merits.

## *Decision Not Appealed*

As noted above, the Defendants did not appeal Judge McCurn's Decision I, granting them

injunctive relief.  Defendants offer several justifications for not having appealed the decision.

First,  according to the Defendants, "no appeal was necessary as the court granted the preliminary

injunction." *See* Defendants' Memorandum in Opposition, pp. 6-7.  Secondly, Defendants

contend that Judge McCurn's Decision I was not subject to appeal because courts "review

judgments, not statements in opinions."  *See* Defendants' Supplemental Memorandum in

Opposition, p. 5.  Thirdly, Defendants cite *Elkin v. Metro. Prop. & Cas. Ins. Co.* (*In re*

*Shkolnikov*), 470 F.3d 22, 24 (1st Cir. 2006) for the proposition that "a party cannot prosecute an

appeal from a judgment in its favor."  *See* Defendants' Supplemental Memorandum in

Opposition, p. 5 (quoting *In re Shkolnikov*).

The Second Circuit Court of Appeals has recently visited this issue and acknowledged that

"[a] party who receives all that he has sought generally is not aggrieved by the judgment affording

23

the relief and cannot appeal from it." *See Trust for the Certificate Holders of the Merrill Lynch Mortgage Investors, Inc. v. Love Funding Corp.*, Nod. 07-2050-cv, 07-1285-cv, 2007 U.S. App. LEXIS 18237, at *5 (2d Cir. Aug. 1, 2007) (quoting *Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326, 333 (1980).   However, the Second Circuit Court of Appeals, as well as the Supreme Court in *Deposit Guaranty*, also held that "in an appropriate case, a party who has prevailed on the merits may appeal from an adverse ruling collateral to the judgment on the merits. . .so long as that party retains a stake in the appeal satisfying the requirements of Art. III." *Love Funding Corp.*, 2007 U.S. App. LEXIS 18237, at *5 (citing *Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. at 333) (quotation marks omitted).   This Court believes that Judge McCurn's ruling on whether Algonquin held a security interest in the tort judgment proceeds constituted such an adverse ruling collateral to the granting of the preliminary injunction, and that Algonquin had every right to appeal that ruling.   Defendants' other arguments regarding the futility of appealing Judge McCurn's ruling likewise fail.

### *Affidavits by Attorneys Lacking Personal Knowledge*

Defendants' contention that the requisite finality was lacking due to the fact that the evidence submitted to the *Trafalgar* court was based on affidavits of attorneys without personal knowledge does not merit significant discussion or analysis.   The record before Judge McCurn contained sufficient affidavits from the parties themselves.[14]

Defendants also cite to Judge McCurn's statement that it "is undisputed that the . . .

---

[14] If Defendants mean to argue that because the appraisals of TPI's facilities were not accompanied by affidavits from parties with personal knowledge Judge McCurn's ruling was not final (*see* Defendants' Memorandum in Opposition, p.6), they fail to support this contention with any case law of reasoned argument.   The Court sees no reason why this would render Judge McCurn's Decision I less than final.

Indenture does not specifically identify TPI's $7.6 million judgment even though the parties knew of the judgment when entering into that agreement." *See* Defendants' Memorandum in Opposition, p. 7, quoting *Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, 131 F. Supp. 2d. at 348. This, Defendants argue, demonstrates that "the record was not fully developed and that a full hearing on the issues was not conducted because it is beyond dispute that the tort judgment was not entered against . . . Stetson-Harza until 1999, or some three years after the [Revised Indenture] was executed." *See* Defendants' Memorandum in Opposition, p. 7. The Court acknowledges that Judge McCurn's statement may be technically incorrect. However, it is easy to see that the point Judge McCurn was making was that at the time the Indenture was drafted the parties were aware of the tort *claim.*

Defendants do not dispute that the tort claim existed when the parties executed the Indenture. The substitution of the word "judgment" for "claim" does not, in this Court's opinion, indicate that the record was not fully developed and that a hearing was necessary. Consequently, each of the five reasons Defendants argue that Judge McCurn's Decision I was not final for purposes of res judicata or collateral estoppel fails.

**Exception to Rule that Preliminary Injunction will not be Given Preclusive Effect**

Based on the above conclusions, the Court must examine whether the instant case falls within the exception to the general rule that a preliminary injunction will not have preclusive effect. Here it is worth quoting the language of U.S. District Judge Robert W. Sweet of the Southern District of New York in the *Don King Prods., Inc. v. Douglas* decision in some detail:

There are exceptions to the general rule [that findings in a preliminary injunction

25

> proceeding are seldom considered sufficiently final to be given preclusive effect],
> arising in circumstances where a ruling is rendered "'practically' final owing to
> factors demonstrating that it was not avowedly tentative [ ], the adequacy of the
> hearing, and the opportunity for review.  Thus, estoppel on occasion has been
> based upon preliminary injunction findings made after extensive hearing and
> briefing consolidated with trial on the merits . . . or where it was fair to regard
> findings as practically final because the party seeking to avoid the preclusive
> effect of a preliminary injunction ruling, affirmed on appeal, had been the ones
> [sic] that chose the original litigation forum, instituted the preliminary relief
> application, and had, therefore, a full opportunity to present all crucial evidence
> and witnesses.

*Don King Prods., Inc. v. Douglas*, 742 F. Supp. at 754-55 (citations and quotation marks

omitted).

Algonquin, the party seeking to avoid the preclusive effect of Judge McCurn's ruling, was

the party which chose the original litigation forum, instituted the preliminary relief application,

and, in the Court's opinion, had a full and fair opportunity to make its case.  The only possible

variance between these finality factors, as set forth in *Don King Prods.*, and those in the instant

case is that Judge McCurn's ruling was not affirmed on appeal.  As discussed *supra*, Algonquin

had a clear opportunity to appeal Judge McCurn's Decision I as to its ruling on the purported

security interest in the tort judgment proceeds.  Moreover, the Second Circuit Court of Appeals,

while addressing the issue of finality in the context of the preclusive effect of a preliminary

injunction proceeding, has held that "[f]inality in the context here relevant may mean little more

than that the litigation of a particular issue has reached such a stage that a court sees no really

good reason for permitting it to be litigated again." *Lummus Co. v. Commonwealth Oil Ref. Co.*,

297 F.2d at 89.

_____Based on the foregoing analysis, the Court believes that Judge McCurn's finding in

*Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, 131 F. Supp. 2d. 341 (N.D.N.Y. 2001), that

26

Defendants did not have a valid security interest in the tort claim or Stetson-Harza Judgment,

should be afforded preclusive effect.

## Defendants Arguments concerning their alleged Security Interest in the Stetson- Harza Judgment

In spite of the finding that Judge McCurn's Decision I precludes Defendants' litigating

this point again, an analysis of Defendants' substantive claims regarding their purported security

interest in the Stetson-Harza Judgment would not be out of place here.  As such, the remainder

of this Decision addresses the several arguments Defendants make in support of their position.

### *Algonquin's Purported Security Interest*

There are several problems with Defendants' argument that under Connecticut common

law the Indenture grants Algonquin a security interest in the tort judgment. The first is that, by

Defendants' own admission, "[w]hat has not been directly addressed in Connecticut common law

is whether tort claims for. . . engineering malpractice claims can be assigned." *See* Defendants'

Memorandum in Opposition, p. 12.  Nevertheless, this admitted lack of relevant precedent fails

to deter Defendants.  Their memorandum goes on to engage in a facial analysis of several

Connecticut cases, from which the strongest support Defendants can distill is that one case

"*suggested*" that an earlier case, namely *Gurski v. Rosenblum & Filan LLC,* 885 A.2d 163, 168

(Conn. 2005), which even the Defendants admit did not rule on the issue of assignability of tort

claims for property damage, held that the issue of the assignability of tort claims for property

damage depended on public policy.  *See* Defendants' Memorandum in Opposition, p. 14, citing

*Esposito v. CPM Ins. Servs., Inc.*, No. 001145, 001151, 2006 Conn. Super. LEXIS 467, at *18

27

(Conn. Super. Ct. Feb. 9, 2006). Defendants then infer that because there is no policy consideration militating against the assignment of the Stetson-Harza claim or judgment, the Stetson-Harza claim is assignable under Connecticut common law.

This argument is unavailing in several respects. First, the premise that the Stetson-Harza claim or judgment is one for property damage, rather than engineering malpractice, is false: in his decision, Judge Hurd found that the proper measure of damages "*should be* . . . the difference in value between the plants as constructed and if properly constructed." *See Hydro Investors*, 63 F. Supp. 2d. at 229 (emphasis added). Judge Hurd noted, however, that "[t]he difficulty with this measure of damages is that there was no allegation of improper construction. Moreover, the plants cannot be properly constructed . . . because of the physical limitations at the sites." *Id.* Judge Hurd went on to agree with TPI's use of the revenue lost (as a direct result of Stetson-Harza's engineering malpractice) during the 1988-2000 duration of the Niagara Mohawk contract as the proper measure of damages. This measure of lost revenues for the 1988-2000 period, according to Judge Hurd, "represents the difference in value of the power plants as constructed and the value of the power plants properly constructed so as to produce the projected energy and revenue levels." *Id*. at 229-30. This is not a tort claim for property damage. It is a claim for engineering malpractice in which, *as a measure of damages*, the court relied on an analysis of revenue lost by the plaintiff during a specific period of time.

Second, even if the engineering malpractice claim *were* a tort claim for property damage, the case law cited does not support Defendants' contention that the tort claim is assignable. As noted above, the best case Defendants could muster merely *suggested* that an earlier case held that the issue of the assignability of tort claims for property damage *depended on public policy*.

Third, Defendants do not even attempt to address how the assignment of an engineering malpractice claim, or the Stetson-Harza claim in particular, would or would not fall within the ambit of public policy. The entire argument collapses in on itself.

Even more troubling is that this is the logical *threshold* Defendants must cross in order to make their argument that the Indenture and/or the Consolidation Agreement (governed by Connecticut law) *does in fact* assign Algonquin a security interest in the Stetson-Harza claim. Although the Court has just found that Defendants have not demonstrated that an engineering malpractice claim *may* be assigned under Connecticut common law, Defendants' argument that those documents do assign such an interest will be treated next.

<u>Connecticut Common Law</u>

Defendants contend that the Indenture grants Algonquin an interest in "each and every one of the . . . contracts . . . and other agreements . . . including, *without limitation*, those assigned agreements described in Annex 3 . . ." Defendants' Memorandum in Opposition, p. 9, quoting Indenture, Clause A, pp. 2-3 (emphasis added). Defendants argue that the words "without limitation" compel the result that the Indenture grants Algonquin an interest in the Stetson-Harza claim or judgment, despite the lack of any reference whatsoever to any tort claim in the extensive litany of "leases, contracts, permits, licenses, franchises, certificates, insurance policies, warranties, bonds and other agreements" which comprises Annex 3.

Defendants also rely on Clause A of the Indenture because it grants Algonquin an interest in "all Property . . . of the companies . . ." *See* Defendants' Memorandum in Opposition, p. 9 quoting Indenture at Clause A, p. 2-3. However, Defendants' assertion that the Indenture's definition of Property is all inclusive pursuant to Connecticut common law runs aground. In

*Schoonmaker v. Lawrence Brunoli, Inc.*, 828 A.2d 64 (Conn. 2003), the Connecticut Supreme Court held that "'to constitute an assignment there must be a purpose to assign or transfer the whole or part of some particular thing, debt, or chose in action, and the subject matter of the assignment *must be described with such particularity as to render it capable of identification.*'" *Id.* at 79, quoting *Dysart Corp. v. Seaboard Surety Co.*, 240 Conn. 10, 17, 688 A.2d 306 (1997) (emphasis added).  The Indenture's failure to mention any tort claim at all, much less the Stetson-Harza tort claim with any level of "particularity as to render it capable of identification" is fatal to Defendants' contention that the Indenture assigns Algonquin an interest in that claim.  This is especially so given the fact that Defendants' predecessor in interest, Aetna, was well aware of the tort claim when the Revised/Amended Indenture was drafted.  If the Defendants' interpretation of the word "property" were to prevail, the drafters of such Indentures could conclude their drafting of the granting clauses with the words "all property."  There would be no reason or need for the detailed descriptions of property and collateral contained in the Indenture itself and its appendices.  The actual drafting and interpretation of security agreements is not so simple as to treat a phrase such as "all property" as a comprehensive and all-encompassing legal term-of-art.[15]

_____

[15] It is true that Revised UCC § 9-504 does allow for supergeneric terms such as "all assets" in financing statements.  This section reads, in relevant part: "A financing statement sufficiently indicates the collateral that it covers if the financing statement provides: . . . an indication that the financing statement covers all assets or all personal property." C.G.S.A. § 42a-9-504 and N.Y. UCC § 9-504.  This does not apply to security agreements, however.  Revised UCC § 9-203(b)(3)(A) still requires that a security interest will be enforceable and attach only when, *inter alia*, "the debtor has authenticated a security agreement *that provides a description of the collateral* . . ." C.G.S.A. § 42a-9-203(b)(3)(A) and N.Y. UCC § 9-203(b)(3)(A) (emphasis added).  In a security agreement, "a description as 'all the debtor's assets' or 'all the debtor's personal property' . . . does not reasonably identify the collateral." C.G.S.A. § 42a-9-108(c).  *See also* N.Y. UCC § 9-108(c) (stating that "[s]upergeneric description [is] not sufficient.  A description of collateral as 'all the debtor's assets' . . . does not reasonably identify the collateral.")

_New York Common Law_

Defendants' next claim that the Consolidation Agreement is governed by the law of New York.  The Defendants correctly point out that this agreement was amended by the Modification Agreement executed on January 15, 1996 (Plaintiff's Ex. P). This document expressly provides that it "shall  be governed by, and construed and enforced in accordance with, the internal law of the state of Connecticut."  _Id._ at p. 6.  Defendants, however, do not concede even this point, and maintain that, as with the original Consolidation Agreement, New York law still applies because of the Modification Agreement's provision that "[a]ll of the terms and conditions of the Existing Mortgage and the collateral security provided thereby are hereby ratified and confirmed in all respects and shall remain in full force and effect."  _See_ Defendants' Supplemental Memorandum in Opposition, p .7, quoting the Extension and Modification Agreement of January 15, 1996 (Plaintiffs' Ex. P) at p. 6.  However, Defendants fail to cite the very next sentence in the Modification Agreement, which states that the Consolidation Agreement has not been modified or amended "_[e]xcept as expressly provided herein_. . ."  _Id._  The Court reads the Modification Agreement's provision that the law of Connecticut shall apply to be an express modification of the Consolidation Agreement.  As a result, the same conclusion reached _supra_ holds in this instance; that under Connecticut common law, assignment requires, _inter alia_, a description of the subject matter being transferred or assigned "with such particularity as to render it capable of identification."  _See Schoonmaker v. Lawrence Brunoli, Inc._, 828 A.2d at 79.  Thus, both the Consolidation Agreement and the Modification Agreement's failure to mention a tort claim at all is fatal to Defendants' argument that either of those Agreements assigns an interest in the tort claim to Algonquin under Connecticut common law.

Even accepting Defendants' premise as correct, that New York law does apply, Defendants' argument still fails. This is because Defendants base their contention that the Consolidation Agreement assigns an interest in the tort claim on the Consolidation Agreement's reference to interests which include any recovery relating to a reduction in value of the Indenture Estate. *See* Defendants' Memorandum in Opposition, p. 16, citing Consolidation Agreement at p. 7-8, specifically ¶¶ 10, 12 and 14. As discussed *supra*, the Stetson-Harza Judgment is not a tort claim for property damage. It is a claim for engineering malpractice in which, as a measure of damages, the court relied on an analysis of revenue lost during a specific time period. The award by Judge Hurd was not based on condemnation or eminent domain proceedings, as referenced in ¶ 10,[16] or refunds of taxes, assessments, etc. as referenced in ¶ 12. Instead, Judge Hurd opined that the damages awarded TPI were based on "[t]he loss of revenue for the thirteen year period from 1988-2000 represent[ing] the difference in value of the power plants as constructed and the value of power plants properly constructed so as to produce the projected energy and revenue levels." *See Hydro Investors*, 63 F. Supp. 2d at 230. However, it is not possible to deduce from this statement that the damages represent an award for the "decrease in the value of such property. . ." as specified in the Consolidation Agreement. This is so because Judge Hurd made a point of noting that the damages "[do] *not* provide compensation for losses after the end of the Niagara Mohawk contract in 2000 nor for continuing to be the owner of power plants which, because of

---

[16] The Consolidation Agreement language cited by Defendants ("decrease in the value of such property") in ¶ 10 applies only to "condemnation, eminent domain or similar proceeding[s] . . ." *See* Consolidation Agreement, pp. 7-8; Plaintiff's Supplemental Memorandum, pp. 11-12. This fact becomes clear only when the relevant paragraph is read *in toto*, and the Agreement describes the mortgagee's authorization to settle, compromise or litigate "all proceeding[s] in connection with *any such taking* . . ." *Id.* (emphasis added). The tort claim at issue is not in any way related to a taking of any kind.

the low power outputs, are not economically feasible." *Hydro Investors*, 63 F. Supp. 2d. at 230 (emphasis added). In fact, Judge Hurd acknowledged that the property "cannot be properly constructed . . . because of the physical limitation at the sites." *Id.* at 229. The damages awarded in the *Hydro* tort action were for engineering malpractice, based on a *loss of revenue* for the period 1988 to 2000 due to the underperformance of the plants as constructed, and not for any actual "decrease in value of the property."

*Change in Type of Collateral*

Defendants argue that even if Connecticut law acted as a bar to the Indenture or Consolidation Agreement's ability to assign an interest in the tort claim, that bar disappeared when the Stetson-Harza Judgment was rendered. Defendants also contend that the tort claim changed collateral type again when Stetson-Harza appealed and posted a bond, making the collateral a claim against a bond, then a claim under a contract, then a fund in a restricted escrow account. Defendants maintain that the Indenture grants Algonquin a security interest, under the Connecticut UCC, in each of these types of collateral (judgment, claim against a bond, claim under a contract, and a fund under a restricted escrow account). The Court finds such arguments completely unavailing. It is sufficient only to review the case law Defendants cite in support of this argument.

In *Fleet Bank, N.A. v. Coffin*, No. H-90-204, 1992 U.S. Dist. LEXIS 6614, at *19-20 (D. Conn. April 10, 1992) the debtor executed a written document granting Virginia National Bank a security interest in and to any proceeds to specified litigation. The *Coffin* court held that the bank's security interest did not attach until the property, the proceeds of the litigation, came into existence. However, in *Coffin* the debtor had *expressly granted* the bank a security interest in the

33

litigation proceeds.  This is more than enough to distinguish the case, as well as *In re Stone*, 52 B.R. 305 (Bankr. W.D. Ky. 1985).

Defendants believe *Stone* to be relevant because in that case the court found that a creditor's interest in cattle included proceeds from the settlement of a tort claim against the cattle's veterinarian for negligence which led to the death of 300 cattle.  However, the *Stone* court's holding is actually much narrower than a cursory glance reveals.  The court actually held only that "monies received in settlement of a tort claim *for the tortious damage or destruction* of secured collateral are proceeds under the provisions of [the Kentucky U.C.C.]." *See id.* at 308. There was clearly no tortious damage to, or destruction of, collateral in the instant case.

Defendants cite *In re Vienna Park Properties*, 976 F.2d 106 for the proposition that a fund in a restricted escrow account is a general intangible.  From that limited finding, Defendants (as they did with the *Coffin* case, *supra*) attempt to bootstrap themselves into the position that a security interest in general intangibles, which they assert both the Indenture and Consolidation Agreement granted to Algonquin, attaches to a fund in a restricted escrow account.  However, the parties to the escrow account in *Vienna Park* had *expressly assigned their interests in the escrow agreement* to a third party in a valid security agreement.  The *Vienna Park* court had to reach only the narrow issue as to whether the escrow account was an intangible in order to determine the correct perfection procedure.[17]  If one assumes that the Indenture or the Consolidation Agreement expressly assigned a security interest in the tort claim or its proceeds in the escrow account, it

---

[17] And even on this point the Second Circuit Court of Appeals held that the district court was only "likely correct" in classifying the escrow account as a general intangible.  In fact, as that finding was not necessary to the Court of Appeals' holding in *Vienna Park*, even that limited finding is merely *dicta*.

becomes much easier to find relevant case law.  In reality, however, neither the Indenture nor the

Consolidation Agreement contains such an express grant or assignment of a security interest.  It

is difficult not to sense a pronounced lack of actual support for Defendants' position in light of

the fact that their nearly exhaustive memoranda fail to cite one case (or secondary authority)

which holds that a security agreement granting a security interest in general intangibles (as

opposed to an express grant of an interest in the account itself) attaches to the funds in an escrow

account.

The *Stone*, *Coffin* and *Vienna Park* cases provide no support for Defendants' argument

that a change in the status of the purported collateral (from a claim to a judgment to a "claim

against a bond" to a "claim under a contract" to a "fund in a restricted escrow account") results

in the Indenture or Consolidation Agreement granting an interest in the proceeds.  If the security

agreement does not expressly grant a security interest in the underlying tort claim or its proceeds,

no subsequent transformation will magically result in an automatic attachment of those proceeds.

*Revised New York Article 9 Applies*

Defendants next make the argument that Revised Article 9, which is applicable to grants

of security interests in commercial tort claims and became effective on July 1, 2001, applies in

this case.   Defendants contend that, as a result, the security interests granted under the

Consolidation Agreement automatically attached and became perfected as of July 1, 2001.  To

support their contention that Revised Article 9 applies even though the relevant underlying

documents were all executed well before Revised Article 9's effective date, Defendants,

paraphrasing Rev. N.Y. UCC § 9-702(a), maintain that "Revised Article 9 applies to a transaction

or lien within its scope, even if the transaction or lien was entered into or created before Revised

Article 9 takes effect." *See* Defendants' Memorandum in Opposition, p. 19. However, Defendants' contention that Revised Article 9 applies to this particular pre-effective date transaction fails on more than one front.

First, Rev. N.Y. UCC § 9-702(b)(1) and (2) set out the rules for a transaction which was specifically not covered by pre-Revised UCC law, but would have been covered had the transaction occurred after the effective date of the Revised UCC. Both parties admit that commercial tort claims fall into this category. For these types of transactions, the Revised Code gives the parties an option: these pre-effective date transactions may be "terminated, completed, consummated, and enforced under this article. However, these transactions also may be terminated, completed, consummated, and enforced by the law that otherwise would apply had this article not taken effect." *See* Rev. N.Y. UCC § 9-702, Official Comment 1. *See also* Ingrid Michelsen Hillinger and Michael G. Hillinger, *2001: A Code Odyssey (New Dawn for the Article 9 Secured Creditor)*, 106 Com. L.J. 105, 154-55 (2001).

Because there is absolutely no indication that the parties took any affirmative action whatsoever to either terminate or consummate the existing Indenture or Consolidation Agreements pursuant to Official Comment 1 of Rev. N.Y. UCC § 9-702, the Court finds that the pre-Revised UCC, which specifically excluded commercial tort claims from its scope, is the relevant law.

Second, Rev. N.Y. UCC § 9-702(c) makes an exception for certain pre-effective date transactions, effectively preventing Revised Article 9 from applying in "an action, case, or proceeding commenced before [Revised Article 9] takes effect." *See* Rev. N.Y. UCC § 9-702(c). In the instant case, as the Defendants' own Statement of Material Facts demonstrates, Algonquin

commenced an action in August 2000 alleging that TPI's assignment of the Stetson-Harza Judgment to Pine Run was a fraudulent transfer and/or conversion, followed by its application for a preliminary injunction and/or an order of attachment regarding the proceeds of that judgment. *See* Defendants' Fed.R.Bankr.P. 7056 Statement of Material Facts, ¶¶ 40-42.  In fact, and as discussed *supra*, Judge McCurn's Decision I specifically addresses Algonquin's claim that the Indenture granted it a security interest in the judgment. *See Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, 131 F. Supp. 2d. at 348.

Defendants effectively counter, however, that the instant adversary proceeding, as well as the Plaintiffs' bankruptcy cases, were commenced after the Effective Date of Revised UCC. The Court does not need to reach the issue as to which commencement date (Plaintiffs' bankruptcy, Defendants' 2000 action or the instant Adversary Proceeding) would be relevant to the proper interpretation of Rev. N.Y. UCC § 9-702(c).  The Court's determination that pursuant to Rev. N.Y. UCC § 9-702(b)(1) and (2) the Revised UCC does not apply is sufficient.

However, as with several of Defendants' arguments, even if Defendants' contention that Revised Article 9 applies is accepted, it still avails them nothing.  In this instance, if Revised Article 9 were to apply, Defendants might seem to be closer to their goal because Revised Article 9 does include commercial tort claims within its scope.  However, Revised Article 9 provides some guidance as to what will suffice in order for attachment of a tort claim to occur.  Official Comment 15 to Rev. N.Y. UCC § 9-109 states that "*a description of collateral in a security agreement as 'all tort claims' is insufficient to meet the requirement for attachment*."[18] (emphasis

---

[18] Defendants do not refer to this Official Comment in their papers.  Defendants' counsel did mention it at oral argument, however, asserting correctly (but to little purpose) that Revised Article 9 does not require any specific "*magic words*" which would meet the attachment

added).  Neither the Revised Indenture nor the Consolidation Agreement contain language even remotely as specific as "all tort claims."  This Court finds that if the words "all tort claims" in a security agreement are insufficiently specific to effect attachment of a commercial tort claim in the opinion of the drafters of Revised Article 9, the even less descriptive language upon which Defendants are attempting to rely is clearly not sufficiently specific either.

## CONCLUSION

The Court concludes that Judge McCurn's finding that Defendants' claim to have been granted a security interest in the Stetson-Harza Judgment "lacks merit" was, by the standards contained in *Don King Prods., Inc. v. Douglas*, 742 F. Supp. at 754-55 and *Lummus Co. v. Commonwealth Oil Ref. Co.*, 297 F.2d at 89, sufficiently final as to be accorded preclusive effect. Each of Defendants' arguments to the contrary are addressed in the discussion section of this Decision, and found unavailing.

In the alternative, the Court's analysis of the substantive arguments for and against Algonquin's having been granted an interest in the tort claim, Stetson-Harza Judgment and any of its subsequent iterations, reveals no basis upon which to credit Defendants' contention that it has a valid interest in those funds under New York or Connecticut statutes or common law.

Based on the foregoing, it is hereby

**ORDERED** that Plaintiffs' motion for Summary Judgment is GRANTED; and it is further

**ORDERED** that Defendants' motion for Summary Judgment is DENIED.

———————————

requirement.

38

Dated at Utica, New York

this 30th day of October 2007

/s/    Hon. Stephen D. Gerling
STEPHEN D. GERLING
Chief U.S. Bankruptcy Judge